## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| PATRICK PURSLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15 C 4313 |
| | ) | |
| TARRY WILLIAMS; RANDY | ) | Honorable Virginia M. Kendall |
| PFISTER; JERMIAGH DALY; | ) | |
| JAMES LOUCH; JON | ) | Honorable M. David Weisman |
| LUCHSINGER; DR. SALEH | ) | |
| OBAISI; KEVIN HOLLARAN | ) | |
| WEXFORD HEALTH SOURCES, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## FIRST AMENDED COMPLAINT

NOW COMES Plaintiff, Patrick Pursley, by and through his attorneys Loevy & Loevy, and complaining of Defendants Tarry Williams, Randy Pfister, Saleh Obaisi, Jermiagh Daly, James Louch, Jon Luchsinger, Kevin Hollaran, and Wexford Health Sources, Inc. states as follows:

### Introduction

1.     Mr. Pursley was confined at Stateville Correctional Center for more than 20 years for a crime that he did not commit.

2.     During his confinement, Mr. Pursley suffered numerous violations of his constitutional rights, including denial of medical care and inadequate and dangerous conditions of confinement. For both of these violations, Mr. Pursley's complaints fell on the Defendants' deaf ears.

## Jurisdiction and Venue

3. This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331.

4. Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district; on information and belief, all Defendants reside in this judicial district; and the events giving rise to Plaintiff's claims asserted herein all occurred within this judicial district.

## Parties

5. Plaintiff Patrick Pursley is a resident of Rockford, Illinois. At the time of the events at issue, Mr. Pursley was incarcerated at Stateville Correctional Center at 16380 Route 53, Crest Hill, Illinois 60403.

6. At all times relevant to his involvement in this case, Defendant Tarry Williams was the Warden at Stateville. As warden, Defendant Williams was an employee of the Illinois Department of Corrections, and was responsible for the implementation, oversight, and supervision of policies and practices at Stateville. Defendant Williams is sued here in his individual capacity. At all times relevant to the events at issue in the case, Defendant Williams was acting under color of law and within the scope of his employment with the IDOC. Defendant Williams is named as a defendant in his individual capacity.

7. At all times relevant to his involvement in this case, Defendant Randy Pfister was the Warden at Stateville. As warden, Defendant Pfister was an employee of the Illinois Department of Corrections, and was responsible for the implementation, oversight, and supervision of policies and practices at Stateville.

2

Defendant Pfister is sued here in his individual capacity. At all times relevant to the events at issue in the case, Defendant Pfister was acting under color of law and within the scope of his employment with the IDOC. Defendant Pfister is named as a defendant in his individual capacity.

8.    At all times relevant to his involvement in this case, Defendant Jermiagh Daly was Chief Engineer at Stateville. As the chief engineer, Defendant Daly was an employee of the Illinois Department of Corrections, and was responsible for the implementation of policies, procedures, and orders related to the maintenance, care, and service of Stateville. At all times relevant to the events at issue in this case, Defendant Daly was acting under color of law and within the scope of his employment with the IDOC. Defendant Daly is named as a defendant in his individual capacity.

9.    At all times relevant to his involvement in this case, Defendant James Louch was Chief Engineer at Stateville. As the chief engineer, Defendant Louch was an employee of the Illinois Department of Corrections, and was responsible for the implementation of policies, procedures, and orders related to the maintenance, care, and service of Stateville. At all times relevant to the events at issue in this case, Defendant Louch was acting under color of law and within the scope of his employment with the IDOC. Defendant Louch is named as a defendant in his individual capacity.

10.    At all times relevant to his involvement in this case, Defendant Jon Luchsinger was Chief Engineer at Stateville. As the chief engineer, Defendant

3

Luchsinger was an employee of the Illinois Department of Corrections, and was responsible for the implementation of policies, procedures, and orders related to the maintenance, care, and service of Stateville. At all times relevant to the events at issue in this case, Defendant Luchsinger was acting under color of law and within the scope of his employment with the IDOC. Defendant Luchsinger is named as a defendant in his individual capacity.

11.     At all times relevant to his involvement in this case, Defendant Saleh Obaisi was a physician at Stateville, an employee of and final policymaker for Wexford, and was responsible for the implementation, oversight, and supervision of policies and practices at Stateville. Defendant Obaisi is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Obaisi was acting under color of law and within the scope of his employment.

12.     At all times relevant to his involvement in this case, Defendant Kevin Hollaran was the CEO of Wexford Health Sources, Inc. and an employee of and final policymaker for Wexford. Defendant Hollaran is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Hollaran was acting under color of law and within the scope of his employment.

13.     Defendant Wexford Health Sources, Inc. (Wexford) is a corporation headquarted in Pennsylvania transacting business in Illinois. Wexford, pursuant to a contract with the State of Illinois, is a healthcare provider for IDOC prisons throughout the State. At all times relevant to the events at issue in this case, Wexford was responsible for the implementation, oversight, and supervision of

4

policies and practices at Stateville and the IDOC generally. As an agent of the IDOC, Wexford was at all times relevant to the events at issue in this case acting under color of law by and through its lawful agents, including the individual Defendants and other unknown healthcare employees at Stateville.

## FACTS

14.    Plaintiff, Patrick Pursley, was wrongfully convicted of murder and was sentenced to life without parole. Following his sentencing in 1994, Mr. Pursley was housed in Stateville Correctional Center ("Stateville"). On March 3, 2017, Mr. Pursley's life sentence was overturned. He was released on April 27, 2017 after being granted bond while awaiting appeal.

## Conditions of Stateville's C-House

15.    Mr. Pursley was housed at Stateville for over twenty years until he was granted bond in April 2017.

16.    Over the course of those years, Mr. Pursley was housed both in F-House and C-House.

17.    While at Stateville, Mr. Pursley suffered challenging conditions that made everyday life difficult, painful, and dangerous.

18.    Throughout his time served in C-House, Mr. Pursley lived in a facility that is over a century old and in need of serious repair to make it habitable. In the years before Mr. Pursley was released from IDOC custody, Defendants stopped making any meaningful repairs to the facility, leaving it dilapidated.

19.     On a daily basis, Mr. Pursley woke in a cell that was poorly insulated and ventilated, with vermin present throughout the facility, unclean living areas, and damaged sewage systems.

20.     While living in C-House, Mr. Pursley was never fully sheltered from the elements – throughout the facility, there were windows with broken glass or windows that would not close completely, ceilings and walls that were cracked, and damaged building structures both inside and outside of C-House.

21.     Mr. Pursley notified correctional staff about the conditions of the windows he saw in his area, including the three windows with broken glass and the sixteen (16) that did not close – even when staff attempted to close them, He also informed them he could see that the caulk around the windows had worn away, preventing them from being properly insulated. Correctional staff told Mr. Pursley that they would request repairs, yet up until his release, the windows were still broken.

22.     Because the windows did not close completely, Mr. Pursley was exposed to below freezing temperatures as temperatures dropped in the fall and winter, preventing any warmth from the heating system when it was on. Additionally, given the limited time when the heat was on in the colder months, Mr. Pursley often faced weeks where there was no reprieve at all, and would spend entire days shivering.

23.     Mr. Pursley notified correctional staff about the cracks to the foundation and facade of the building, the worn caulking around windows, and the

6

resultant cold temperatures throughout the cells. The temperatures inside of the building would drop dramatically on cold nights and the concrete structure would stay cold well into the next day, making it colder inside the building than outside in the winter.

24.     As a result of the structural damage that permitted temperatures to fall below freezing, Mr. Pursley was put at a greater risk of contracting contagious illnesses. Furthermore, with the inadequate clothing and blankets provided, Mr. Pursley had no way to combat these freezing temperatures or prevent himself from falling ill.

25.     Specifically, Mr. Pursley complained of the freezing temperatures to correctional staff, who refused to provide him a coat or blanket to keep himself warm until into the month of November. Until then, Mr. Pursley was forced to use one thin blanket because he had no other way of obtaining a blanket or coat. By the time any additional clothing was provided, the temperature in the facility had grown so cold that he would spend the night shivering.

26.     Along with the bitter cold, Mr. Pursley contended with cockroaches, spiders, and all manners of insects that would disturb him throughout the day and into the night.

27.     Mr. Pursley could see these insects both during the day and at night, but at night, he could feel them crawling on him, which kept him from being able to sleep. He would wake with skin irritation from these bug bites. Mr. Pursley attempted to keep his cell clean to discourage any insects from bothering him, but to

no avail because he was never given adequate cleaning supplies and the infestation was so widespread that it was unavoidable.

28.     The insect infestations throughout the Stateville facilities led to Mr. Pursley experiencing bug bites and facing the disturbance of bugs crawling on him when he attempted to sleep. These bites led to rashes on Mr. Pursley's body.

29.     In addition to enduring vermin in his cell, Mr. Pursley had to contend with birds throughout the facility, which would defecate in the kitchen and cafeteria where Mr. Pursley ate.

30.     The presence of these animals made dining unsanitary and exposed Mr. Pursley to greater risk of disease through both animal dander and excrement in and around food. These birds were visible throughout meal times and Mr. Pursley even notified correctional staff that was in the dining area with him.

31.     Mr. Pursley was also exposed to illness in the form of filthy trays that were "washed" in smelly brown water. The dishwasher, which was often broken, did not adequately wash the dishes or even sanitize them. Instead, it left bits of food particles, an oily film, and other substances on the dishes that were reserved to prisoners at the next meal.

32.     In addition, there were animal feces throughout the dining area and kitchen, and the food often made him physically ill. Mr. Pursley noticed and told correctional staff that the prisoners who were serving the food sometimes had to stand in puddles of brown water from toilets and sinks because the sewage system was backed up.

33. Exposure to both unsanitary trays and animal excrement encouraged the spread of disease. These dining conditions gave Mr. Pursley near-constant pain in his stomach and led him to take antacids for the majority of his time in Stateville.

34. During the time spent in his cell, Mr. Pursley again could find no moment to rest because he was never provided the supplies needed to clean his cell. At most, Mr. Pursley was given watered down cleaners, but that was no match for a facility with century-old filth accumulating and a lack of repairs that allowed mold and standing water to proliferate in the vents and walls.

35. In spite of attempts to clean with the watered down supplies he was provided, Mr. Pursley was never able to feel clean. Toilets were never completely clean, the floors, walls, and ceilings showed signs of caked on dirt, and Mr. Pursley could see mold in shower drains, on sinks, and on walls and vents both in his cell and throughout the facility.

36. The sum of these conditions resulted in Mr. Pursley suffering both physical and psychological injury. The prolonged exposure to these conditions led to an increased spread of disease and disorder, including Mr. Pursley's respiratory and digestive disorders.

37. Throughout his time in Stateville, Mr. Pursley suffered from prolonged respiratory infection that included severe coughing, vomiting, shortness of breath, and tightness in his chest that prevented him from sleeping or completing everyday tasks without pain.

38.     Mr. Pursley also dealt with stomach pain that led him to seek prescriptions for antacids for years because the food and dining conditions led to stomachaches, stomach cramps, and abdominal pain.

## Denial of Medical Care

39.     In addition to being subjected to the conditions expressed above, any injuries or medical conditions in Stateville – including those that resulted from the aforementioned conditions – were exacerbated by the lack of medical care at Stateville.

40.     During his time at Stateville, Mr. Pursley suffered from a prolonged respiratory infection. He was also denied adequate medical care for a rib injury.

41.     In 2014, Mr. Pursley began suffering from a severe respiratory infection that caused persistent and painful coughing, vomiting, inhibited his ability to speak, prevented him from sleeping, and caused burning in his chest and migraines.

42.     Mr. Pursley requested medical attention from medical staff at Stateville by submitting numerous requests for medical attention. Mr. Pursley's requests received no response from medical staff for over a month and a half.

43.     In September 2014, Mr. Pursley contacted Defendant Obaisi to indicate that he had been suffering from a severe respiratory infection since April 2014 and that he was still suffering from fluid on his lungs, shortness of breath, and tightness in his chest.

44.     Mr. Pursley suffered from the pain of this respiratory infection for over a year. The entire time, he continued to suffer from coughing, shortness of breath, headaches, and tightness in his chest that prevented him from sleeping.

45.     In October 2014, Mr. Pursley suffered from a rib fracture that caused him extreme pain that was so severe that it prevented him from sleeping.

46.     Mr. Pursley requested medical attention from medical staff at Stateville by submitting numerous requests for medical attention. Mr. Pursley's requests received no response from medical staff for over two weeks.

47.     By the time Mr. Pursley was seen by a doctor, his rib had begun to set out of place, resulting in a lump in his chest that still causes persistent burning and pain and prevents him from sitting upright comfortably for sustained periods of time.

48.     The conditions of Stateville and the lack of medical care continued throughout Mr. Pursley's confinement, resulting in prolonged injury and constant exposure to risks of harm and injury. To this day, Mr. Pursley must deal with the lingering pain and injury from his time in Stateville that impair his daily activities.

## CLAIMS
## COUNT I
## Prison Conditions Constituting Cruel and Unusual Punishment
*U.S. Const. amends. VIII & XIV via 42 U.S.C. § 1983*
[Defendants Williams, Pfister, Daly, Louch, and Luchsinger]

49.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

11

50.     This claim seeks damages for Plaintiff's injuries. The damages claims are lodged against Defendants Williams, Pfister, Daly, Louch, and Luchsinger. The damages claims are lodged against those Defendants in their personal capacities.

51.     Defendants Williams, Pfister, Daly, Louch, and Luchsinger were or are state actors.

52.     At all times relevant to their involvement in this case, Defendants Williams, Pfister, Daly, Louch, and Luchsinger were responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the conditions of confinement at Stateville; the training of IDOC staff at Stateville on maintaining functional facilities and repair of facilities; and the supervision of IDOC staff at Stateville who were tasked with the upkeep, care, and repair of Stateville facilities.

53.     Prior to the events giving rise to Plaintiff's Complaint, Defendants Williams, Pfister, Daly, Louch, and Luchsinger had notice of widespread policies and practices that allowed the facilities at Stateville to deteriorate and remain inadequately kept so as to endanger the welfare of inmates like Mr. Pursley. It is common at Stateville to see facilities in disrepair, and for complaints and grievances to be routinely ignored by correctional employees. Despite knowledge of these problematic policies and practices, Defendants Williams, Pfister, Daly, Louch, and Luchsinger did nothing to ensure that the conditions at Stateville were adequate, thereby acting with deliberate indifference.

54.     Specifically, there exist widespread policies or practices at Stateville pursuant to which prisoners live in conditions that are constitutionally inadequate, including policies and practices pursuant to which: (1) facilities are not maintained to prevent exposure to freezing temperatures, vermin infestation, mold proliferation, or unsanitary kitchen and dining conditions; (2) facilities are not cleaned and disinfected to prevent the spread of communicable diseases or mold; (3) personnel fail to provide prisoners with adequate cleaning supplies; (4) personnel fail to provide timely responses to prisoners requests to repair facilities; and (5) correctional personnel commonly fail or refuse to respond adequately when prisoners request repairs.

55.     These widespread policies and practices were allowed to flourish because Defendants Williams, Pfister, Daly, Louch, and Luchsinger, who oversaw the conditions of confinement Stateville, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct. In this way, Defendants Williams, Pfister, Daly, Louch, and Luchsinger violated Mr. Pursley's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

56.     The above-described widespread policies and practices, so well settled as to constitute de facto policy at Stateville, were able to exist and thrive because Defendants Williams, Pfister, Daly, Louch, and Luchsinger were deliberately indifferent to the problem, thereby effectively ratifying it.

57. Mr. Pursley suffered physical injury caused by exposure to Stateville's conditions.

## COUNT II
## Denial of Medical Care
*U.S. Const. amend. VIII via 42 U.S.C. § 1983*
[Defendants Wexford, Obaisi, Hollaran, Williams, and Pfister]

58. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

59. As described more fully above, Defendants had notice of Mr. Pursley's medical needs and the seriousness of his medical needs, and knew the risk of harm to Mr. Pursley if he did not receive appropriate medical care. Despite that knowledge, Defendants failed to provide him with any proper medical care or access to medical care, in violation of the Eighth Amendment to the United States Constitution.

60. As a result of Defendants' unjustified and unconstitutional conduct, Mr. Pursley experienced pain, suffering, emotional distress, and injury.

61. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and/or with reckless indifference to Mr. Pursley's rights.

62. Alternatively, Defendants were deliberately indifferent to Mr. Pursley's objectively serious medical needs, and their actions were undertaken intentionally, with malice and/or with reckless indifference to Mr. Pursley's rights.

14

63.    Mr. Pursley's injuries were proximately caused by policies and practices of Defendants.

64.    At all times relevant to their involvement in this case, Defendant Wexford was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding medical care at Stateville; the training of IDOC and Wexford staff at Stateville on providing medical care to prisoners, and providing prisoners access to medical care; and the supervision of IDOC and Wexford staff at Stateville who provided medical care and were responsible for providing prisoners access to medical care.

65.    Prior to the events giving rise to Plaintiff's Complaint, Defendant Wexford had notice of widespread policies and practices by healthcare and correctional employees at Stateville pursuant to which prisoners like Mr. Pursley with serious medical needs were routinely denied medical care and access to medical care. It is common at Stateville to see prisoners with clear symptoms of serious medical needs who repeatedly request medical evaluation or treatment, and whose requests are routinely delayed or completely ignored by healthcare and correctional employees. Despite knowledge of these problematic policies and practices, Defendant Wexford did nothing to ensure that prisoners at Stateville received adequate medical care and access to medical care, thereby acting with deliberate indifference.

66.    Specifically, there exist widespread policies or practices at Stateville pursuant to which prisoners receive unconstitutionally inadequate healthcare and

15

are denied access to constitutionally adequate healthcare, including policies and practices pursuant to which: (1) healthcare personnel commonly fail to respond or respond inadequately to prisoners who have requested medical attention or medication, or asked to see a doctor; (2) healthcare personnel commonly fail to respond or respond inadequately to prisoners who exhibit obvious signs of a serious medical condition; (3) healthcare personnel with inadequate training, qualifications, and experience are charged with the responsibility of screening and evaluating prisoner complaints and requests for medical care; (4) healthcare personnel fail to provide timely healthcare to prisoners; (5) inadequate levels of healthcare staffing are maintained; (6) correctional personnel commonly fail or refuse to respond adequately when prisoners request medical attention or ask to see a doctor; and (7) the system by which prisoners request medical evaluation or treatment fails to notify appropriate staff of a prisoner's request or complaint.

67.     These widespread policies and practices were allowed to flourish because Defendant Wexford, who oversaw the provision of healthcare to prisoners at Stateville and were responsible for ensuring that prisoners have access to medical care, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct. In this way, Defendant Wexford violated Mr. Pursley's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

16

68.     The above-described widespread policies and practices, so well settled as to constitute de facto policy at Stateville, were able to exist and thrive because Defendant Wexford was deliberately indifferent to the problem, thereby effectively ratifying it.

69.     At all times relevant to their involvement in this case, Defendant Wexford was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding medical care at Stateville; the training of IDOC and Wexford staff at Stateville on providing medical care to prisoners, and providing prisoners access to medical care; and the supervision of IDOC and Wexford staff at Stateville who provided medical care and were responsible for providing prisoners access to medical care..

70.     Prior to the events giving rise to Plaintiff's Complaint, Defendants Obaisi and Hollaran had notice of widespread policies and practices by healthcare and correctional employees at Stateville pursuant to which prisoners like Mr. Pursley with serious medical needs were routinely denied medical care and access to medical care. It is common at Stateville to see prisoners with clear symptoms of serious medical needs who repeatedly request medical evaluation or treatment, and whose requests are routinely delayed or completely ignored by healthcare and correctional employees. Despite knowledge of these problematic policies and practices, Defendant Obaisi did nothing to ensure that prisoners at Stateville received constitutionally adequate medical care and access to constitutionally adequate medical care, thereby acting with deliberate indifference.

17

71.     Specifically, there exist widespread policies or practices at Stateville pursuant to which prisoners receive unconstitutionally inadequate healthcare and are denied access to constitutionally adequate healthcare, including policies and practices pursuant to which: (1) healthcare personnel commonly fail to respond or respond inadequately to prisoners who have requested medical attention or medication, or asked to see a doctor; (2) healthcare personnel commonly fail to respond or respond inadequately to prisoners who exhibit obvious signs of a serious medical condition; (3) healthcare personnel with inadequate training, qualifications, and experience are charged with the responsibility of screening and evaluating prisoner complaints and requests for medical care; (4) healthcare personnel fail to provide timely healthcare to prisoners; (5) inadequate levels of healthcare staffing are maintained; (6) correctional personnel commonly fail or refuse to respond adequately when prisoners request medical attention or ask to see a doctor; and (7) the system by which prisoners request medical evaluation or treatment fails to notify appropriate staff of a prisoner's request or complaint.

72.     These widespread policies and practices were allowed to flourish because Defendants Obaisi and Hollaran, who oversaw healthcare and correctional employees at Stateville and were responsible for ensuring that prisoners had access to constitutionally adequate medical care, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct. In this way, Defendants Obaisi and

18

Hollaran violated Mr. Pursley's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

73.     The above-described widespread policies and practices, so well settled as to constitute *de facto* policy at Stateville, were able to exist and thrive because Defendant Obaisi was deliberately indifferent to the problem, thereby effectively ratifying it.

74.     At all times relevant to their involvement in this case, Defendants Williams and Pfister were responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding prisoners' access to constitutionally adequate medical care at Stateville; the training of IDOC staff at Stateville on providing prisoners access to medical care; and the supervision of IDOC staff at Stateville.

75.     Prior to the events giving rise to Plaintiff's Complaint, Defendants Williams and Pfister had notice of widespread policies and practices by healthcare and correctional employees at Stateville pursuant to which prisoners like Mr. Pursley with serious medical needs were routinely denied medical care and access to medical care. It is common at Stateville to see prisoners with clear symptoms of serious medical needs who repeatedly request medical evaluation or treatment, and whose requests are routinely delayed or completely ignored by healthcare and correctional employees. Despite knowledge of these problematic policies and practices, Defendants Williams and Pfister did nothing to ensure that prisoners at

Stateville received constitutionally adequate medical care and access to constitutionally adequate medical care, thereby acting with deliberate indifference.

76.     Specifically, there exist widespread policies or practices at Stateville pursuant to which prisoners receive unconstitutionally inadequate healthcare and are denied access to constitutionally adequate healthcare, including policies and practices pursuant to which: (1) healthcare personnel commonly fail to respond or respond inadequately to prisoners who have requested medical attention or medication, or asked to see a doctor; (2) healthcare personnel commonly fail to respond or respond inadequately to prisoners who exhibit obvious signs of a serious medical condition; (3) healthcare personnel with inadequate training, qualifications, and experience are charged with the responsibility of screening and evaluating prisoner complaints and requests for medical care; (4) healthcare personnel fail to provide timely healthcare to prisoners; (5) inadequate levels of healthcare staffing are maintained; (6) correctional personnel commonly fail or refuse to respond adequately when prisoners request medical attention or ask to see a doctor; (7) correctional staff commonly fail to provide adequate access to care for inmates; and (8) the system by which prisoners request medical evaluation or treatment fails to notify appropriate staff of a prisoner's request or complaint.

77.     These widespread policies and practices were allowed to flourish because Defendants Williams and Pfister, who oversaw healthcare and correctional employees at Stateville and were responsible for ensuring that prisoners had access to constitutionally adequate medical care, directly encouraged the very type of

misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct. In this way, Defendants Williams and Pfister violated Mr. Pursley's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

78.     The above-described widespread policies and practices, so well settled as to constitute de facto policy at Stateville, were able to exist and thrive because Defendants Williams and Pfister were deliberately indifferent to the problem, thereby effectively ratifying it.

79.     Mr. Pursley's injuries were caused by employees of IDOC and Wexford, including the individually named Defendants, who acted pursuant to the foregoing policies and practices in engaging in the misconduct described in this Count.

## COUNT III
### Respondeat Superior

[Defendant Wexford]

80.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

81.     In committing the acts alleged in the preceding paragraphs, Defendant Obaisi was an employee, member, and agent of Wexford, acting at all relevant times within the scope of his employment.

82.     Consequently, Defendant Wexford is liable for the actions of its employee acting within the scope of his employment under state law.

83. Defendant Wexford, as a private corporation acting under color of state law, should additionally be held liable under 42 U.S.C. § 1983 for the conduct of its employees acting within the scope of their employment. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 793–95 (7th Cir. 2014).

Wherefore, Plaintiff Patrick Pursley respectfully requests that this Court enter a judgment in his favor and against Defendants Tarry Williams, Randy Pfister, Saleh Obaisi, Jermiagh Daly, James Louch, Jon Luchsinger, Kevin Hollaran, and Wexford Health Sources, Inc. awarding compensatory damages, punitive damages, injunctive relief, attorneys' fees and costs, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, Patrick Pursley, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**PATRICK PURSLEY**

By: /s/ Aisha N. Davis
*One of Plaintiff's Attorneys*

Jon Loevy
Aisha N. Davis
LOEVY & LOEVY
311 N. Aberdeen Street, 3rd Floor
Chicago, IL 60607
(312) 243-5900
(312) 243-5902 (Fax)